CV 13 - 3355

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

Case No. 05-MD-1720 (JG) (JO)

This Document Relates To:

WEINSTEIN, J.

VISA U.S.A. INC., VISA INC., and VISA
INTERNATIONAL SERVICE ASSOCIATION,

Plaintiffs,

-against-

WAL-MART STORES INC.,

Defendant.

**COMPLAINT FOR
DECLARATORY JUDGMENT**

Visa U.S.A. Inc., Visa Inc., and Visa International Service Association ("Visa

International," and together with Visa U.S.A. Inc. and Visa Inc., "Visa") allege against Wal-Mart

Stores Inc. ("Wal-Mart," or the "Defendant") as follows:

**NATURE OF THE ACTION**

1.      Visa brings this action for declaratory judgment pursuant to 28 U.S.C. § 2201 to

resolve a long-standing dispute with Wal-Mart, the world's largest retailer (by far).  The dispute

was the subject of class action lawsuits filed by Wal-Mart and others against Visa and

MasterCard Incorporated ("MasterCard") in 1996.  *In re Visa Check/MasterMoney Antitrust*

Litigation (the "*Visa Check Litigation*" or "*Visa Check*").[1]  Shortly after the settlement of that lawsuit and the payment by Visa and MasterCard of substantial sums to Wal-Mart and the plaintiff class in that action, a new collection of class action lawsuits was filed against Visa and MasterCard raising many of the same issues.  *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 05-md-1720 (E.D.N.Y. Nov. 27, 2012) (Gleeson, J.) (Orenstein, M.J.) (the "*Interchange Fee Litigation*").  In the *Interchange Fee Litigation*, many of the same claims and issues that were raised in the *Visa Check* case were again asserted.

2.    The *Interchange Fee Litigation* was also settled (the "Interchange Settlement"),[2] with the settlement again providing for substantial payments to merchants and requiring Visa to make significant changes to certain of its rules relating to all merchants ("Merchant Rules").[3] Wal-Mart, however, has opted out of the settlement and has publicly opposed and denigrated the Interchange Settlement at every opportunity, apparently preferring to continue litigating with Visa, seemingly forever.  Upon information and belief, Wal-Mart intends to bring a third lawsuit for the same alleged antitrust violations against Visa, continuing 17 years of seriatim litigation over the same issues.

3.    In making clear its intention to bring an opt-out action against Visa, Wal-Mart has made plain that it will assert essentially the same claims as those brought in the *Visa Check* and *Interchange* lawsuits.  Both of those litigations have included claims that Visa and MasterCard entered into agreements to establish default interchange rates at artificially high levels, that their

---

[1] *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) (finally approving settlement), *aff'd Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 124 (2d Cir. 2005) ("*Visa Check* Order and Final Judgment").

[2] The Interchange Settlement is still subject to final approval by the Court.

[3] The Merchant Rules challenged in the *Interchange Litigation* include, *without limitation*, the no-surcharge rule, the honor-all-cards rule as applied to credit cards, the honor-all-cards rule as applied to debit cards, and the non-discrimination rule.

respective Merchant Rules constituted unlawful restraints, and therefore that the "merchant discount fees" that merchants pay to acquiring banks had been artificially inflated to supra-competitive levels.

4.    Visa has maintained, and continues to maintain, that Wal-Mart's claims lack merit. For one thing, in setting default interchange rates and in establishing and maintaining its Merchant Rules, Visa did not violate any antitrust laws and in fact behaved pro-competitively and in a manner that expanded all relevant business and retail output and volume, including for Wal-Mart as well as for other merchants across America, large and small. Moreover, by virtue of Wal-Mart's sheer size and its enormous payment card transaction and dollar volumes, the "default" interchange fees about which it and other merchants have complained (in the aforementioned litigations and elsewhere), but which were paid not by Wal-Mart or other merchants but by their respective acquiring banks, did not apply to credit and debit card transactions at Wal-Mart locations. Instead, interchange rates paid by Wal-Mart's acquiring bank as to Visa credit and debit card transactions[4] at Wal-Mart locations (physical and online) were low negotiated rates that reflect Wal-Mart's negotiating leverage.

5.    A declaration in Visa's favor against Wal-Mart is necessary to prevent the continuation of endless, wasteful litigation between the parties. Put simply, Visa seeks finality in its dispute with Wal-Mart. The dispute between the parties is ripe and justiciable, and conservation of judicial resources weighs strongly in favor of resolving it now, in this Court, without further wasteful litigation in other fora.

6.    To resolve the parties' dispute expeditiously and finally, Visa here seeks a declaration that from January 1, 2004 to November 27, 2012, the time period for which the

---

[4] As of October 1, 2011, debit interchange rates were subject to a regulated cap.

Defendant may, as an opt-out, seek damages under the Interchange Settlement (the "Damages Period"), Visa's conduct in, among other things, continuing to set its "default interchange" rates, maintaining its "honor all cards" rules, enforcing its other Merchant Rules, and restructuring itself did not violate federal antitrust law or the antitrust laws of the several States or the District of Columbia.

      7.      Specifically, Visa contends that:

     (i)      Visa's default interchange rules and the manner in which it established default interchange during the Damages Period did not violate the Sherman Act, any other federal antitrust law, or the antitrust laws of the several States or the District of Columbia;

    (ii)      Visa Merchant Rules, each standing alone or viewed together with other such rules and/or default interchange rules, did not violate the Sherman Act, any other federal antitrust law, or the antitrust laws of the several States or the District of Columbia during the Damages Period;

   (iii)      The Visa IPO did not violate federal antitrust law or the antitrust laws of the several States or the District of Columbia.

   (iv)      Wal-Mart is an indirect purchaser that cannot recover antitrust damages under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977);

    (v)      There was no concerted action among Visa, MasterCard, or any of Visa's customer banks regarding the Visa Merchant Rules and/or the Visa interchange rules or rates during the Damages Period that could support a claim under the Sherman Act, before or after the Visa IPO in March 2008; and

(vi)     The *Visa Check* release bars Wal-Mart's claims with respect to the Damages
Period.

## JURISDICTION AND VENUE

8.      This Complaint is filed pursuant to 28 U.S.C. § 2201(a) to resolve an actual
controversy between the parties.  The parties' disputes arise under Sections 1 and 2 of the
Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4, 7, and 16 of the Clayton Act, 15 U.S.C.
§§ 15, 18, and 26, as well as under various state antitrust and unfair competition laws.  This
Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337, 2201,
and 2202, and has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

9.      An actual and ripe case or controversy exists as between Visa and Defendant as to
all matters alleged herein.  Defendant has opted-out of the Interchange Settlement and
specifically the Rule 23(b)(3) Interchange Settlement class.  Defendant has made clear that it
intends to pursue its own antitrust damages claims against Visa with respect to the Damages
Period.  Upon information and belief, Wal-Mart has relinquished its right to substantial monies
from the Interchange Settlement to continue litigation in yet another lawsuit.  Under these
circumstances, an actual case or controversy exists, and Visa need not wait for Defendant to
bring its own action to seek a declaration from the Court.

10.     This Court has personal jurisdiction over the Defendant, either because it
conducts continuous and systematic business in New York pursuant to N.Y. C.P.L.R. § 301, or it
transacts business within New York pursuant to N.Y. C.P.L.R. § 302.  Wal-Mart previously
chose to bring the *Visa Check* lawsuit in this District.

11.     Venue in the Eastern District of New York is proper under 28 U.S.C. § 1391 and
15 U.S.C. § 22.  Visa transacts business and is found in the Eastern District of New York, and

Defendant, as noted, has previously chosen to be party to litigation in this District on the issues raised herein.  A substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within the Eastern District of New York.

12.     The Eastern District of New York is, in fact, the sole venue with jurisdiction over whether the *Visa Check* settlement bars Wal-Mart's opt-out claims in the *Interchange Fee Litigation*, as Visa alleges.  Judge Gleeson's Order and Final Judgment approving the *Visa Check* settlement releases provides that this Court "retains *exclusive* jurisdiction" over "any suit, action, proceeding or dispute arising out of or relating to [the *Visa Check*] Order and Final Judgment, the Settlement Agreement or the applicability of the Settlement Agreement and exhibits thereto," including, but not limited to, any suit that asserts the *Visa Check* settlement release "as a defense in whole or in part . . . or otherwise raise[s] [it] as an objection." *Visa Check* Order and Final Judgment ¶ 16 (emphasis added).

13.     Moreover, Visa's settlement with the *Visa Check* plaintiffs provides that the settling parties "irrevocably submit to the exclusive jurisdiction of the United States Court for the Eastern District of New York for any suit, action, proceeding or dispute arising out of or relating to this Settlement Agreement or the applicability of this Settlement Agreement and exhibits hereto.  All applications to the Court with respect to any aspect of the Settlement should be presented to and determined by United States District Judge John Gleeson." Visa Settlement Agreement ¶ 39(a).

14.     Wal-Mart was the lead plaintiff, and a member of the settlement class, in the *Visa Check* case and is subject to the terms of the *Visa Check* release.  Because Visa is seeking a declaration that Wal-Mart's state and federal antitrust claims are barred by the *Visa Check*

6

settlement release, whether the *Visa Check* settlement now bars Wal-Mart's opt-out claims is squarely within the ambit of its continuing and exclusive jurisdiction provision.

**PARTIES**

15.     Visa Inc. is a global payments technology company that enables consumers, businesses, financial institutions, and governments to use electronic payments instead of cash and checks, and has built one of the world's most advanced processing networks. Visa Inc. is incorporated in the State of Delaware and has its principal place of business in Foster City, California. Visa U.S.A. Inc. and Visa International are wholly-owned subsidiaries of Visa Inc., incorporated in Delaware, and have their principal places of business in Foster City, California. Visa's operating revenues for 2012 were approximately $10.4 billion.

16.     Wal-Mart is a Delaware corporation with its principal place of business in Bentonville, Arkansas. In its 1999 *Visa Check* complaint, Wal-Mart alleged that "Wal-Mart, with annual sales of approximately $105 billion, owns and operates thousands of Wal-Mart retail stores throughout the United States, including this District." Wal-Mart's reported net sales for the first quarter of 2013 were $113.4 billion. It reported fiscal year 2013 sales of approximately $466 billion. During the Damages Period, Wal-Mart accepted Visa products, both credit and debit, in its over 4,000 United States stores. However, Sam's Club, a membership-only retail chain and subsidiary of Wal-Mart, did not accept Visa credit and debit cards throughout the Damages Period; rather, for certain sub-periods, it accepted Visa credit and debit cards on its website and at fuel pumps, but only Interlink, Visa's pin-only network, in stores.

**FACTUAL ALLEGATIONS**

**I.      Interchange in the Visa Payment Card Systems**

7

17.     The Visa network facilitates the transfer electronically of data and funds among "merchant acquirers" (described below) and credit card issuing banks ("issuers") when payment cards, mobile devices, and other new form factors are used to make purchases.  Visa accomplishes this function by, among other things, prescribing standard data formats and network operating rules to govern the transfer of data and funds among these separate entities.

18.     In the Visa network, payment card transactions involve at least four parties in addition to the network itself:  (i) the cardholder; (ii) the issuer that issued the cardholder's payment card; (iii) the merchant that accepts the cardholder's payment card as a form of payment; and (iv) the merchant acquirer with which the merchant has contracted to process the payment card transaction.  Visa payment card transactions may involve additional parties where the merchant acquirer network customer has contracted with a third party processor, an independent sales organization ("ISO"), or a customer service provider to provide merchant processing services.

19.     In the United States, there are thousands of issuers that issue Visa-branded payment cards to cardholders, and hundreds of merchant acquirers—including acquiring customers of Visa, as well as third party processors, ISOs, and customer service providers—that process Visa-branded payment card transactions for merchants.  Thus, Visa's customer banks serve either (or both) of two separate functions in the Visa network.  They issue payment cards to cardholders (and are referred to as "issuers" or "issuing banks") and/or they acquire and process payment card transactions from merchants (and are referred to as "merchant acquirers" or "acquiring banks").

20.     Typically, when a cardholder presents a Visa-branded payment card for payment, the merchant must seek authorization for the transaction.  The merchant inputs the cardholder's

payment card information into a terminal and transmits that information to its merchant acquirer

(or some other third-party intermediary with which the merchant has contracted) for verification

and processing, which, in turn, transmits the information through the Visa network for

authorization by the issuing bank that issued the cardholder's payment card.  If the issuing bank

approves the transaction, it transmits a message through the same network to the merchant

acquirer for ultimate transmission to the merchant that the transaction has been authorized.  The

merchant then completes the transaction with the cardholder.

21.     Completed transactions are cleared and settled through the Visa network in a

process called "settlement."  The transaction is "settled" when the issuing bank transfers funds to

the Visa network, the Visa network transfers funds to the merchant acquirer, and the merchant

acquirer pays the merchant.

22.     Visa establishes its own set of rules, which are designed to ensure that its payment

card network functions predictably and reliably, for the benefit of all participants.  Thus, for

example, Visa has required each acquiring bank to ensure that its merchants accept all credit or

debit cards that bear its respective brands regardless of the card's issuer or other card

characteristics.  These rules, the "honor-all-cards" rules, have played a key role in the efficient

functioning of the Visa payment service network because they have allowed a wide variety of

banks to issue cards under the Visa brand and therefore create card products that the thousands of

card-issuing banks could not offer individually.  Indeed, without this rule, merchants could

discriminate against community banks, credit unions, and thrifts that issue Visa-branded cards,

accepting cards only from those large banks that have offered them special discounts or other

incentives.  Additionally, the "honor-all-cards" rules benefit consumers.  Consumers avoid the

time and effort necessary to determine whether each merchant at which the consumer shops will

9

accept the consumer's particular Visa card for payment at the checkout counter. Without the "honor-all-cards" rules, merchants could pick and choose which Visa credit or debit cards to accept, causing consumer confusion and diminishing the brand.

23.     Visa's rules also have required each issuing bank to transfer funds to the merchant acquirer in exchange for a payment established either by bilateral agreement between the issuer and the acquirer or, absent such an agreement, by default through the network. (Oct. 2010 Visa Rules,[5] Ch. 7, at 612, Ch. 10, Core Principle 10.3.) The payment is called the "interchange fee," which, as class plaintiffs in the *Visa Check* case have acknowledged, is "a fee that the bankcard acquiring institution pays to the card issuing institution for each retail transaction where the issuer's card is used as a payment device at one of the acquirer's retail store accounts." (*Visa Check* Compl.[6] ¶ 8(o).)

24.     Visa's default interchange rules accomplish many pro-competitive purposes, including the following:

a.   They avoid the need for time-consuming and inefficient individual bilateral agreements between the thousands of bank issuers and hundreds of bank acquirers in the Visa network. The cost of negotiating these bilateral agreements would drive up the costs of Visa payment card transactions.

b.   A default set of interchange rules corrects a flaw inherent in an alternative system of bilateral negotiations, which is that network participants would face the possibility of no acceptable agreement being reached among

---

[5] Visa International Operating Regulations (Oct. 15, 2010) ("Oct. 2010 Visa Rules").

[6] Second Amended Consolidated Class Action Complaint in *In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238-JG, 1999 WL 34848247 (E.D.N.Y.) ("*Visa Check* Compl.").

participants—destroying the fundamental assurance of ubiquitous transaction acceptance vital to customers and the network's existence.

c.  A default set of interchange rules also promotes competition by removing a competitive disadvantage that community bank, credit union, and thrift issuers would otherwise have relative to large bank issuers.  Smaller issuers lack both the resources and the leverage to negotiate rates with the many acquiring banks. Consequently, if no default interchange rate existed, some merchants would not be able to accept cards from small issuers because those issuers would not have been able to negotiate a contractual relationship with the merchants' acquiring banks.

d.  Similarly, default rates protect smaller merchants' ability to compete with behemoths like Wal-Mart.  Large merchants like Wal-Mart can, and do, negotiate low custom interchange rates.  Because small merchants lack the bargaining power to negotiate rates, absent default interchange they would likely be forced to accept far higher merchant discount fees and hard pressed to compete with large merchants.

e.  Visa can and does provide interchange incentives to improve the quality of its network service by adopting new and improved technologies.  For example, Visa has used interchange as a strategic tool to strengthen system security, improve the quality of transaction data, and drive other issuer incentives or acquirer incentives to generally improve the quality of its network.

f.   Visa has modified its default interchange fees so as to accomplish very rapid migration to electronically authorized transactions, with benefits for all stakeholders—cardholders enjoy faster speed at the point of sale, issuers have more accurate information, and merchants experience more rapid checkouts.

g.   Visa has provided interchange incentives to improve the quality of its network services by reducing fraud and chargeback levels.

h.   Visa's default interchange rules have benefited consumers by enabling issuers to improve card features and rewards, and reduce card finance charges and other costs.

i.   Visa's default interchange rules have benefited merchants by providing consumers greater purchasing incentives and thus increasing consumer demand, which increases merchant sales.

j.   Visa sets its own default interchange rates to maximize output of payment card transactions on its network, by increasing consumer usage of cards and increasing card acceptance at merchants.  For example, Visa has independently set default interchange higher for rewards-based card programs to encourage issuers to fund those programs and encourage consumers to carry and use rewards cards.  That market output—as measured by the dollar sales volume of payment card transactions—has increased in recent years confirms the pro-competitive nature of Visa's default interchange rules.

k.  Visa's default interchange rules also provide revenue to bank issuers that enable them to guarantee payment to acquirers for properly authorized Visa card payments.

25.     During the Damages Period, Visa's default interchange rules were necessary, efficient, and pro-competitive.  These rules enabled Visa to compete more effectively by, among other things, offering better, more reliable, and higher value services.  Visa's use of its default interchange rules benefited all participants in the four-party network, including merchants.

26.     The only U.S. case to consider an antitrust challenge to default interchange rules found them to be pro-competitive and lawful after a bench trial.  *National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 596 F. Supp. 1231 (S.D. Fla. 1984), *aff'd*, 779 F.2d (11th Cir. 1986), *cert. denied*, 479 U.S. 923 (1986).  There, the district court concluded that Visa's default interchange "is of vital import to the day-to-day functioning of the system," eliminates the "prohibitive time and expense of price negotiations at the time of the exchange between the thousands of VISA members," and "promotes efficiency and competitiveness" by addressing the "fundamental economic interdependence between card issuing and merchant signing in the system."  The Eleventh Circuit affirmed, emphasizing that default interchange is "a necessary element in the creation of efficiency creating integration," "without which the system would not function," and "is no broader than required for that purpose."

27.     Merchants do not contract directly with Visa or with issuers to accept payment cards; merchants contract either with a merchant acquirer, which may be affiliated with the Visa network, or with a third-party processor, ISO, or customer service provider that is not itself affiliated with Visa but that has contracted with a merchant acquirer of the Visa network to perform certain functions.  To handle the merchant's payment card transactions, the merchant

13

acquirer charges the merchant a fee, known as the "merchant discount fee." Visa plays no part in any acquirer's pricing of the merchant discount fee.

28.     Visa has established Merchant Rules. During the Damages Period, Visa's Merchant Rules, among other things, required merchants to: (i) impose no surcharge on cardholders (consumers) for using Visa-branded payment cards (the "no-surcharge" rule); (ii) accept all Visa-branded credit cards if the merchant accepts any Visa-branded credit cards (the "honor-all-cards" rule as it applies to credit cards); and (iii) accept all Visa-branded debit cards if the merchant accepts any Visa-branded debit cards (the "honor-all-cards" rule as it applies to debit cards). In addition, Visa prohibited merchants at the point of sale from offering to customers that present Visa credit cards discounts that favored competing credit or signature debit cards. Those same "non-discrimination" rules, however, permitted merchants to offer discounts to customers paying with cash, checks, PIN debit, and other forms of payment. (Merchants, however, typically did not offer either kind of discount.)

29.     Visa's Merchant Rules were pro-competitive and were necessary during the Damages Period to facilitate the efficient functioning of its network. These rules not only protected consumer expectations and enhanced competition, but benefited merchants as well, who received greater value from accepting Visa cards the more that consumers use those cards.

30.     The "no surcharge" rule did not unreasonably restrain trade during the Damages Period. By prohibiting surcharges, the "no surcharge" rule has reduced prices for consumers and did not result in antitrust injury during the Damages Period.

31.     The Visa network's "honor-all-cards" rules did not unreasonably restrain trade during the Damages Period. Indeed, despite claiming in the *In re Visa Check* case that Visa's "honor-all-cards" rules were anticompetitive and unlawful per se because they prevented

14

merchants from rejecting unwanted Visa offline debit card payments, after the case settled and Visa modified its "honor-all-cards" rules to allow merchants to reject offline debit card payments, only a few dozen of the many millions of merchants in the certified class chose to stop accepting Visa offline debit card payments.

32.    Visa's "honor-all-cards" rules played a key role in the efficient functioning of its payment service network during the Damages Period because by allowing a wide variety of banks to issue cards under the Visa brand, the "honor-all-cards" rules created card products that the thousands of card-issuing banks could not offer individually. The "honor-all-cards" rules likewise enhanced the efficiency of those products by avoiding the need for thousands of card issuing banks to arrange individually for acceptance at millions of merchants. As the Eleventh Circuit concluded, "universality of acceptance" is the "key element to a national payment system." *National Bancard Corp. v. Visa U.S.A., Inc.*, 779 F.2d 592, 602 (11th Cir. 1986). In addition, the "honor-all-cards" rules benefited consumers by assuring them that their Visa cards would be accepted at merchants that display the Visa logo, regardless of which bank issued the card or what type of card it was. Consumers also avoided the time and effort necessary to determine whether each merchant at which the consumer shopped would accept the consumer's particular Visa card for payment at the checkout counter.

33.    Visa's "non-discrimination" rules during the Damages Period were not anticompetitive. These rules were like those of virtually all payment networks during the Damages Period, prohibiting disparate treatment of Visa's credit cards relative to competing cards. The rules encouraged a level playing field, ensured a consistent experience for Visa credit cardholders, and expanded electronic payment output. Moreover, Visa's "non-discrimination" rules did not result in an unreasonable restraint on trade. The rules did not prohibit merchants

15

from providing discounts for consumers who paid with cash, checks, PIN debit, and other forms

of payment. Despite the ability to provide these discounts, merchants have generally not offered

such discounts to customers. This fact is telling in light of merchant claims that their costs for

accepting these non-credit forms of payment have been lower than for accepting credit

cards. This contradiction suggests that merchants cannot credibly argue that merchants have

been restrained from providing discounts to customers who pay with other forms of payment.

34.     Visa's other Merchant Rules, to the extent relevant, had pro-competitive, not anti-

competitive, effects during the Damages Period.

## II.     At All Relevant Times, Card Transactions at Wal-Mart Locations Were Not Subject to Default Interchange Rates

35.     Wal-Mart is by far the nation's largest merchant, with retail sales and credit and

debit card volumes dwarfing those of even the next largest merchant. Visa-branded credit and

debit card transactions at Wal-Mart retail or online locations during the Damages Period were

not subject to default interchange rates. Rather, they were subject to low negotiated rates that

reflect Wal-Mart's negotiating leverage. Wal-Mart itself does not pay interchange fees. Rather,

Wal-Mart's merchant acquirer pays those fees, as described below.

## III.    Wal-Mart's Merchant Acquirer, Not Wal-Mart, Paid Interchange Fees to the Issuing Banks

36.     During the Damages Period, each of the hundreds of merchant acquirers that

acquired merchants for the Visa network had the independence and discretion to set its own

merchant discount fees and to decide whether and how much of the interchange fees to pass on

as a component of the merchant discount fee it charged its merchant customers; merchant

acquirers bore the risk of interchange fee fluctuations.

37.     Although the arrangements between merchant acquirers and merchants varied,

one fact remained constant: the merchant acquirer paid interchange fees to the appropriate

issuing banks and the merchant paid merchant discount fees to the merchant acquirer.  Merchants never paid interchange fees, and Wal-Mart was not an exception.

### A.     Merchant Acquirers Paid Interchange Fees to Issuers

38.     An interchange fee is compensation paid by the acquiring bank to the issuing bank (via the Visa network) for the transaction when it is settled.

39.     During the Damages Period, Visa maintained its own schedule of default Interchange Fees that could be collected from acquiring customers, depending on the characteristics of the payment card transaction submitted to the Visa network for clearance and settlement.  Visa's default schedule varied substantially relative to MasterCard's, either in the parameters of the categories for which different interchange fees apply, or for the amount of the interchange fees applicable for similar categories.  In 2009, for example, Visa had 60 different interchange rate categories and MasterCard had 243 different interchange rate categories.  In general, Visa classified payment card transactions for interchange purposes according to several categories, including the type of payment card (such as whether the payment card was a debit card and the level of rewards offered), the mode of processing (such as whether the card was present, whether the transaction information was manually or electronically entered into the system, and the level of security protocols observed), the merchant's line of business, and the size of the merchant's transaction volume.

40.     The interchange fee paid by the acquiring bank for a particular payment card transaction is determined by the categories applicable to that particular transaction.

### B.     Wal-Mart Did Not Pay Interchange Fees During the Damages Period; Instead Wal-Mart Paid "Merchant Discount Fees" to Its Merchant Acquirers

41.     Merchant acquirers are free to set the merchant discount fee they charge their merchant customers on the basis of their own profit goals and cost demands, and merchant

discount fees are accordingly negotiated between each merchant and its merchant acquirer. The merchant acquiring business is competitive, and merchant discount fees vary from merchant to merchant as merchant acquirers compete for merchant accounts. Many merchants contract for payment card processing services with ISOs. ISOs purchase processing services from larger merchant acquirers for resale to their own merchant customers.

42.     Although Visa is not a party to these transactions, many merchants negotiated "bundled" or "blended" rate merchant discount fees during the Damages Period, which means that the merchant paid the same merchant discount fee for each transaction or groups of transactions, notwithstanding variations in the merchant acquirer's cost for those transactions depending, among other things, on the specific interchange fee category or agreement applicable to each transaction.

43.     Upon information and belief, other merchants negotiated "interchange-plus" contracts with merchant acquirers, including Wal-Mart. These types of arrangements were not all identical. During the Damages Period there were a number of hybrid types of unbundled pricing, and consequently a single term is oftentimes used amongst industry participants to describe the varying billing and reporting methods.

44.     Upon information and belief, merchants such as Wal-Mart that have entered into interchange-plus contracts typically pay their merchant acquirers an amount equal to the applicable default interchange rates plus the merchant acquirers' fees. Such contracts do not require merchants to purchase a pre-arranged fixed-quantity of processing services from their merchant acquirers.[7]

---

[7] Upon information and belief, merchant acquirers do not always pass on to merchants the full amount of interchange fees.

IV.    **Flexibility of Client Banks Within the Visa System**

A.    **Customer Banks Are Free to Enter into Bilateral Agreements That Alter the Default Interchange Rates**

45.    The Visa interchange rules are default rules that have applied only in those circumstances in which issuing and acquiring customers of Visa have not set their own financial terms for the interchange of Visa transactions.  (May 2005 Visa Rules[8] § 9.5; Nov. 2005 Visa Rules[9] § 9.5; 2006 Visa Rules[10] § 9.5; 2007 Visa Rules[11] § 9.5; 2008 Visa Rules[12] § 9.5; Apr. 2010 Visa Rules,[13] Core Principle 10.3; Oct. 2010 Visa Rules, Core Principle 10.3.)  Further, when the merchant acquirer and the issuing bank were the same entity, default interchange was effectively irrelevant (because the acquirer was paying the interchange fee to itself).  Every Visa issuer has also retained the competitive independence to enter into a bilateral agreement with each Visa acquirer to supersede the default interchange rates Visa has established.

B.    **Customer Banks Have Been Able to Issue Payment Cards of Other Networks, Which Are Realistically Available Alternatives**

46.    Network customers have been free to issue payment cards as customers of other networks.

47.    During virtually all of the Damages Period, for example, customers of Visa were free to issue MasterCard, American Express, and Discover Cards, and some customer banks did issue American Express cards.

---

[8] Visa U.S.A. Inc. Operating Regulations (May 15, 2005) ("May 2005 Visa Rules").

[9] Visa U.S.A. Inc. Operating Regulations (Nov. 15, 2005) ("Nov. 2005 Visa Rules").

[10] Visa U.S.A. Inc. Operating Regulations (Nov. 15, 2006) ("2006 Visa Rules").

[11] Visa U.S.A. Inc. Operating Regulations (May 15, 2007) ("2007 Visa Rules").

[12] Visa U.S.A. Inc. Operating Regulations (Nov. 15, 2008) ("2008 Visa Rules").

[13] Visa International Operating Regulations (Apr. 1, 2010) ("Apr. 2010 Visa Rules").

48. Merchants, including Wal-Mart, accept Visa, MasterCard, American Express, Discover, and China UnionPay payment cards as forms of payment as well as PayPal, cash, and checks.

### C. Customer Banks Have Been Able to Invest in Other Electronic Payment Systems, Which Are Realistically Available Alternatives

49. Customers of Visa are free to invest in other electronic payment systems, including, for example, PayPal. Chase Paymentech Solution has performed merchant acquiring services for merchants using PayPal.

## V. The Relevant Visa Rules Have Remained Largely Unchanged Since the *Visa Check* Settlement

50. Visa first adopted the use of interchange fees in the early 1970s. In May 2005, Visa's default interchange rule was amended to provide expressly: "This section specifies Interchange Reimbursement Fees assessed by Visa to recognize one Member's support of another. These Interchange Reimbursement Fees apply in all circumstances where Members have not set their own financial terms for the Interchange of Visa Transactions." (May 2005 Visa Rules § 9.5.) The May 2005 default interchange fee language remained in the Visa interchange rule until April 2010. (Nov. 2005 Visa Rules § 9.5; 2006 Visa Rules § 9.5; 2007 Visa Rules § 9.5; 2008 Visa Rules § 9.5.) In April 2010, Visa redrafted its interchange rules concerning default interchange fees to read: "Interchange reimbursement fees are determined by Visa and provided on Visa's published fee schedule, or may be customized where members have set their own financial terms for the interchange of a Visa transaction or Visa has entered into business agreements to promote acceptance and card usage." (Apr. 2010 Visa Rules, Core Principle 10.3.) That language remained unchanged in the October 2010 Visa Rules and has not been materially changed since. (Oct. 2010 Visa Rules, Core Principle 10.3.)

51.     Since 1976, Visa has had a rule requiring merchants that accept Visa-branded payment cards to honor all properly presented Visa-branded payment cards. As a result of the *Visa Check* settlement, Visa's honor-all-cards rule permits merchants to choose to accept all properly presented Visa-branded debit cards, or all properly presented Visa-branded credit cards, or both. The 2003 Visa rules provided: "Effective January 1, 2004, a Merchant that wishes to accept Visa Cards must accept any valid Visa Card in its category of acceptance . . . that a Cardholder properly presents for payment." (2003 Visa Rules[14] § 5.2.B.3.b.). This language remained unchanged in the April and October 2010 Visa Rules, except that the 2010 rules refer to "a U.S. Merchant," rather than "a Merchant." (Apr. 2010 Visa Rules, Ch. 6, § 5.2B; Oct. 2010 Visa Rules, Ch. 6, § 5.2.B.) The categories of acceptance to which the rules refer consist of the Visa Credit and Business Category and the Visa Debit Category. (Oct. 2010 Visa Rules, Glossary at 1034.) There have been no material changes to Visa's honor-all-cards rule since the October 2010 Visa Rules were implemented.

52.     Beginning in 1980, Visa prohibited any surcharges to transactions involving Visa-branded payment cards. The 2003 Visa rules provided: "A Merchant must not add: . . . [a]ny surcharge to Transactions." (2003 Visa Rules § 5.2.F.) The April 2010 Visa rules provided: "A U.S. Merchant must not: [a]dd any surcharge to Transactions, except as specified for a Tax Payment Transaction." (Apr. 2010 Visa Rules, Ch. 6, § 5.2.F.) The language in the October 2010 Visa surcharge-related rule remained materially unchanged until January 27, 2013.[15] (Oct. 2010 Visa Rules, Ch. 6, § 5.2.F.)

---

[14] Visa International Operating Regulations (Nov. 15, 2003) ("2003 Visa Rules").

[15] The *Interchange Fee Litigation* settlement modified the no-surcharge rule.

53.     Beginning in 1979, Visa prohibited the establishment of minimum or maximum transaction amounts as a prerequisite for honoring a Visa-branded payment card.  In 2003, the Visa rules provided: "A Merchant must not: . . . [e]stablish a minimum or maximum Transaction amount as a condition for honoring a Visa Card, Electron Card, or Visa Electron Card." (2003 Visa Rules § 5.2.F.)  The April 2010 Visa rules similarly provided: "A U.S. Merchant must not establish a minimum or maximum Transaction amount as a condition for honoring a Visa Card or Visa Electron Card." (Apr. 2010 Visa Rules, Ch. 6, § 5.2.F)  This language remained unchanged until it was modified in response to the adoption of a requirement under federal law that allows merchants to impose $10 minimums on credit card payments.[16]

54.     Beginning in 1993, Visa permitted merchants to offer discounts for cash and other payment methods at the point of sale, provided that any discount offered when cardholders used certain non-Visa-branded payment cards was also offered to Visa cardholders.  The 2003 Visa rules provided: "A Merchant may offer a discount as an inducement for a Cardholder to use a means of payment that the Merchant prefers, provided that the discount is: [c]learly disclosed as a discount from the standard price and [n]on-discriminatory as between a Cardholder who pays with a Visa Card and a cardholder who pays with a 'comparable card.'" (2003 Visa Rules § 5.2.D.2.a.).  This language remained unchanged in the April and October 2010 Visa rules, except that the 2010 rules referred to "a U.S. Merchant," rather than "a Merchant" (Apr. 2010 Visa Rules, Ch. 6, § 5.2.D.2; Oct. 2010 Visa Rules, Ch. 6, § 5.2.D.2), and was in effect until July 25, 2011.[17]

---

[16] Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, § 920 (2010).

[17] This rule was modified as part of the consent decree Visa entered into with the U.S. Department of Justice to resolve *United States of America, et al v. American Express Company, et al.* (No. CV-10-4496 E.D.N.Y.).

VI.     **There Cannot Have Been Any Pre-IPO or Post-IPO Visa Conspiracy During the Damages Period As Banks Did Not Control or Establish Visa's Rules**

55.     At all relevant times, Visa established Visa's default interchange rates.  At no time did Visa consult, let alone enter into any agreement with, any Visa competitor concerning Visa's default interchange rates.

56.     Visa's structure prior to its IPO did not constitute a "structural conspiracy" as previously alleged by plaintiffs in the *Interchange Fee Litigation*.  The fact that senior executives of certain banks sat on Visa's board and/or that banks entered into license agreements by which they agreed to adhere to Visa's rules did not constitute an agreement among those banks, an agreement between those banks and Visa, or an agreement with MasterCard or any other person concerning the setting of default interchange rates.

57.     On October 11, 2006, Visa announced its intention to restructure its organization in order to create a new public global corporation called Visa Inc., the shares of which would be offered to the public via an IPO and thereafter listed on a major stock exchange.

58.     Pursuant to this restructuring, Visa U.S.A. Inc. and Visa International Service Association became subsidiaries of Visa Inc.  Visa's customer banks became stockholders in Visa after its initial public offering.

59.     On March 18, 2008, Visa completed its initial public offering through which it sold more than 400 million shares of voting class A common stock to the general public.

60.     The three classes of Visa stock have different voting and control rights.  One share of class A stock entitles its holder to one vote.  Class B and C common stock, held by the banks that had previously held common stock as customers of Visa's subsidiaries, cannot vote, except in the case of certain "significant transactions" such as "a proposed consolidation or

23

merger, a decision to exit our core payments business or any other vote required by law."
(Amended Visa S-1.[18])

61.     Post-IPO, Visa customer financial institutions may only hold class B and C
common stock and are not permitted to hold voting class A common stock.

62.     Only holders of class A common stock may elect directors to the Visa board.

63.     For approximately three years following the Visa IPO, the Visa board was
required to have been composed of 17 directors—Visa's CEO, 10 independent directors, and six
regional directors affiliated with financial institutions that represent the Visa regions.

64.     Effective January 27, 2011, Visa amended its board composition so that Visa's
board now consists solely of 10 non-bank directors and no longer includes directors representing
the Visa regions.

65.     During the period that Visa was an association and alleged "joint venture," the
setting of interchange fees and Merchant Rules was lawful and pro-competitive as decided by
courts such as *NaBanco*.  Nevertheless, retailers continued to assert the same antitrust claims
repeatedly.  Those claims had no merit pre-IPO, and were even further diluted by Visa's
governance changes and subsequent IPO.  Visa first added to its Board a minority group of
independent directors to approve interchange and pricing decisions.  Subsequently, and today,
those decisions are made by management with reporting to a fully independent public company
board.   Banks could not have conspired to fix interchange fees when they had no power, either
acting individually or collectively, to set interchange fees.

---

[18] Visa Inc. Amendment 4 to Visa Form S-1 Registration Statement, (Feb. 25, 2008) ("Amended Visa S-1").

66.    After the Visa IPO, Visa's management set interchange fees solely for the benefit of Visa's shareholders, and absent approval of Visa's board of directors, no individual entity could own more than 15% of the aggregate shares of the outstanding Visa common stock.

67.    The ownership restrictions help deter any individual third party, including potentially a bank, from taking over Visa.

**VII.    Pre- or Post-IPO, Visa's Rules Have Not Unreasonably Restrained Trade**

68.    Visa's interchange rules did not unreasonably restrain trade during the Damages Period. Visa's interchange rules were not the result of concerted activity among any banks and Visa, or between Visa and MasterCard.

69.    In the last two decades and since Visa's IPO, payment card transaction volume and the concomitant use of payment card network services have increased substantially. The aggregate general purpose credit and signature debit card purchase volumes for Visa and MasterCard (as competitors) increased from approximately $222 billion in 1990 to approximately $2.217 trillion in 2008. In the five years between 2003 and 2008, aggregate general purpose credit and signature debit card purchase volume increased by 67%, from $1.327 trillion in 2003 to $2.217 trillion in 2008. Similarly, over the period from 2000 to 2008, the annual growth rate for Visa credit card spending was 4.1%, which was substantially higher than the annual growth rate of U.S. personal consumption expenditure, after adjusting for inflation, which was 2.6% per year over the same period of time. This rapid growth of Visa spending resulted in Visa's share of U.S. personal consumption expenditures ("PCE") increasing from 7.2% to 8.2% between 2000 and 2008. Interchange rules have had the pro-competitive effect of increasing the dollar volume of Visa-branded transactions, rather than reducing it.

**VIII.    Visa Has Not Monopolized Any Relevant Market**

70.     Visa competes with the network services offered by other networks as well as other payment products. Visa also competes with sellers of other payment card network services for merchant acceptance. Merchants also view Visa acceptance as interchangeable with acceptance of other payment products, including other credit and debit cards, cash, and check, as demonstrated by their efforts to steer consumers between the various forms of payment.

71.     Visa operates in a vibrantly competitive environment, which includes credit cards, cash, checks, ACH, PIN-debit cards, signature-debit cards, prepaid/gift cards, and store-branded cards, among other payment forms. The payments industry is ever-evolving and characterized by shifting shares, efficiency-enhancing innovations in products and processing, and frequent entry of new players.

72.     Visa does not have the power to control prices or exclude competition. Visa competes vigorously with other forms of payment, including other payment card networks like MasterCard, American Express, Discover, and China UnionPay. Indeed, far from being able to control prices, Visa has repeatedly taken steps so as not to be competitively disadvantaged compared to MasterCard and other payments providers.

73.     Further, Visa does not have the power to restrict output. As described in greater detail in paragraph 69 above, Visa's output has been increasing. And, that increase in output did not exclude competition from MasterCard, American Express, or Discover because they too have each increased their output. From 2004 to 2008, credit and charge card purchase volume increased by approximately 26% for MasterCard, approximately 53% for American Express, approximately 44% for Discover, and approximately 35% for Visa. Similarly, Visa's increase in output did not prevent China UnionPay, PayPal, and others from entering the market.

74.     Moreover, Visa's share of total credit and charge purchase volume has decreased. Visa's share of total credit and charge card purchase volume in 2004 was $610.71 of $1,431.44 billion (approximately 42.7%), in 2005 was $675.27 of $1,583.30 billion (approximately 42.6%), in 2006 was $742.39 of $1,748.79 billion (approximately 42.5%), in 2007 was $807.00 of $1,910.12 billion (approximately 42.2%), and in 2008 was $823.74 of $1,942.40 billion (approximately 42.4%). Visa's change in share from approximately 42.7% in 2004 to approximately 42.4% in 2008 is a decrease of approximately 1%.

75.     By virtue of the facts alleged above in paragraphs 70 through 74, Visa has not possessed market power or monopoly power in any properly defined market during the Damages Period.

**IX.    The Settlement and Release in the *Visa Check Litigation***

76.     Many of the allegations and arguments made by Wal-Mart and the merchant class in the *Visa Check Litigation* are identical to the allegations and arguments made by the plaintiffs in the *Interchange Fee Litigation*. The merchant class in *Visa Check* alleged that Visa and MasterCard and their respective customer banks "collectively fix the Visa . . . [and] MasterCard interchange fees." (*Visa Check* Compl. ¶ 45.) The *Visa Check* class alleged that under Visa and MasterCard rules, "retailers are even prohibited from asking a consumer whether she would not mind using a different payment system," including "far less costly forms of payment." (*Id.* ¶ 74, 87.) In their summary judgment motion, the *Visa Check* class plaintiffs claimed that "Visa and MC rules specifically prohibited merchants from engaging in any attempts to discourage the holder of any Visa or MC payment card from using that card -- through verbal or other means, or through discounting or surcharging" and that "Visa and MC's rules explicitly prohibit merchants

from surcharging Visa/MC transactions." (*Visa Check*, Mem. in Supp. of Pls.' Mot. For Sum. J. at 8, 66 (June 7, 2000).)

77.     Before any judgment was reached in the *Visa Check Litigation*, however, the parties settled their claims by entering into a settlement agreement, which this Court approved on January 23, 2004. *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 508 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005), *cert. denied*, 544 U.S. 1044 (2005).

78.     The *Visa Check* settlement:  (i) required the payment of more than $3 billion in cash (Visa Settlement Agreement[19] ¶ 3 ($2.025 billion); (ii) lowered, by roughly one-third, debit interchange rates for the period from August 1, 2003, through December 31, 2003, a reduction valued by the *Visa Check* class plaintiffs at tens of billions of dollars (Visa Settlement Agreement ¶ 8); (iii) required changes to certain network rules, including the honor-all-cards rules (Visa Settlement Agreement ¶ 4), and other merchant acceptance rules (Visa Settlement Agreement ¶ 9); and (iv) left in place the default interchange rules, the no-surcharge rules, the non-discrimination rules and a host of other rules allegedly affecting merchant acceptance of Visa payment cards. *Visa Check*, 297 F. Supp. 2d at 508–12.

79.     The settlement agreement in *Visa Check* contained a release that provided, in full:

> [Visa and its member banks] shall be released and forever discharged from all manner of claims, demands, actions, suits, causes of action against the Released parties [Visa and its member banks], whether class, individual, or otherwise in nature, damages whenever incurred, liabilities of any nature whatsoever, including costs, expenses penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or equity, that any Releasing Party ever had, now has or hereafter can, shall or may have, relating in any way to any conduct prior to January 1, 2004 concerning

---

[19] Visa Settlement Agreement, Visa Check, No. 96-CV-5238 (E.D.N.Y. filed Jun. 4, 2003) ("Visa Settlement Agreement").

any claims alleged in the Complaint or any of the complaints consolidated therein, including, without limitation, claims which have been asserted or could have been asserted in this litigation which arise under or relate to any federal or state antitrust, unfair competition, unfair practices, or other law or regulation, or common law, including, without limitation, the Sherman Act, 15 U.S.C. § 1 et seq. Each Class Member hereby covenants and agrees that it shall not, hereafter, seek to establish liability against any of the Released Parties based, in whole or in part, upon any of the Released Claims.

(Visa Settlement Agreement ¶ 28).

## INTERSTATE COMMERCE

80.     The relevant activities of Visa were within the flow of and had a substantial effect on interstate commerce.

## COUNT I
### (Declaratory Judgment – Section 1 of the Sherman Act)

81.     Visa re-alleges and fully incorporates herein by reference each and every allegation contained in paragraphs 1 through 80 above.

82.     Wal-Mart is unable to establish that Visa is liable under Section 1 of the Sherman Act based upon Visa's default interchange rules or rates or Merchant Rules.

83.     Visa is therefore entitled to a declaration that:

a)      Visa's default interchange rules and the manner in which default interchange was established by Visa did not violate Section 1 of the Sherman Act;

b)      Visa Merchant Rules, each standing alone or viewed together with other such rules and/or default interchange rules, did not violate Section 1 of the Sherman Act; and,

c)      There was no concerted action among (i) any Visa member banks and Visa, or (ii) Visa and MasterCard regarding Visa Merchant Rules and/or

interchange rules or rates that could support a claim under Section 1 of the

Sherman Act.

84.     In addition to the aforesaid declaration, Visa seeks such other and further relief as

the Court deems appropriate.

## COUNT II:
### (Declaratory Judgment Regarding Visa's IPO)

85.     Visa re-alleges and incorporates by reference herein each of the allegations set

forth in paragraphs 1 through 80 above.

86.     Wal-Mart is unable to establish that Visa's IPO violated any federal or state

antitrust law or caused any antitrust injury during the Damages Period.

87.     Visa is therefore entitled to a declaration that its IPO did not violate any federal or

state antitrust law or cause any antitrust injury during the Damages Period.

88.     In addition to the aforesaid declaration, Visa seeks such other and further relief as

the Court deems appropriate.

## COUNT III:
### (Declaratory Judgment – Section 2 of the Sherman Act)

89.     Visa re-alleges and incorporates by reference herein each of the allegations set

forth in paragraphs 1 through 80 above.

90.     Wal-Mart is unable to establish that Visa is liable under Section 2 of the Sherman

Act.

91.     Visa is therefore entitled to a declaration that it did not violate Section 2 of the

Sherman Act.

92.     In addition to the foresaid declaration, Visa seeks such other and further relief as

to the Court deems appropriate.

## COUNT IV:
### (Declaratory Judgment – *Illinois Brick*)

93.     Visa re-alleges and fully incorporates herein by reference each and every allegation contained in paragraphs 1 through 80 above.

94.     At all relevant times, Wal-Mart was an indirect purchaser who cannot recover damages under the federal antitrust laws pursuant to *Illinois Brick*.

95.     Visa is therefore entitled to a declaration that Wal-Mart was an indirect purchaser who cannot recover damages under the federal antitrust laws pursuant to *Illinois Brick*.

96.     In addition to the aforesaid declaration, Visa seeks such other and further relief as the Court deems appropriate.

## COUNT V:
### (Declaratory Judgment – *Visa Check* Release)

97.     Visa re-alleges and fully incorporates herein by reference each and every allegation contained in paragraphs 1 through 80 above.

98.     The *Visa Check* release bars Wal-Mart's claims.

99.     Visa is therefore entitled to a declaration that the *Visa Check* release bars any claims Wal-Mart might assert for the Damages Period.

100.    In addition to the aforesaid declaration, Visa seeks such other and further relief as the Court deems appropriate.

## COUNT VI:
### (Declaratory Judgment – State Antitrust Claims)

101.    Visa re-alleges and fully incorporates herein by reference each and every allegation contained in paragraphs 1 through 80 above.

102.    Wal-Mart is unable to establish that Visa is liable under the laws of the several

31

States or the District of Columbia based upon Visa's default interchange rate and Merchant

Rules or the Visa IPO.

103.    Visa is therefore entitled to a declaration that it is not liable to Wal-Mart under the

laws of the several States or the District of Columbia based upon Visa's default interchange rules

or rates, Merchant Rules, or the Visa IPO.

104.    In addition to the aforesaid declaration, Visa seeks such other and further relief as

the Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Visa respectfully requests that this Honorable Court enter judgment in its

favor and against the Defendant on Counts I through VI granting:

(a)    A declaration pursuant to 28 U.S.C. § 2201 that Visa is not liable under federal antitrust law or the law of the several States and the District of Columbia based upon Visa's default interchange rules or rates, Merchant Rules, or IPOs;

(b)    Costs of this suit; and

(c)    Any such further relief as justice and equity may require.

DATED:    New York, New York            Respectfully submitted,
          June 12, 2013


                                         HOLWELL SHUSTER & GOLDBERG LLP

                                         By: _____
                                         Richard J. Holwell
                                         Michael S. Shuster
                                         Demian A. Ordway
                                         Zachary A. Kerner
                                         125 Broad Street, 39th Floor
                                         New York, NY 10004
                                         (646) 837-5151
                                         mshuster@hsgllp.com

**ARNOLD & PORTER LLP**

Robert C. Mason
399 Park Avenue
New York, NY   10022-4690
(212) 715-1000
robert.mason@aporter.com

Robert J. Vizas
Three Embarcadero Center, Seventh Floor
San Francisco, CA   94111-4024

Mark R. Merley
Matthew A. Eisenstein
555 12th Street, NW
Washington, DC   20004-1206

*Attorneys for Plaintiffs Visa Inc., Visa U.S.A.
Inc., and Visa International Service Association*